



# AGREEMENTS CONCERNING

| | |
|---|---|
| Pension Plan | Appendix A |
| Insurance Program | Appendix B |
| Supplemental Unemployment Benefit Plan | Appendix C |
| Transfers to Other Plants | Appendix D |
| Profit Sharing Plan | Appendix E |
| Protected Employee Group Plan | Appendix F |
| Legal Service Plan | Appendix G |
| Mack-UAW 401(k) Plan | Appendix H |

between

MACK TRUCKS, INC.

and the

INTERNATIONAL UNION,
UNITED AUTOMOBILE
AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA
UAW

AND ITS LOCALS

171, 472, 677, 1247, 2301, 5841

July 20, 1998



# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| Appendix A | Pension Plan................... | A1 - A109 |
| Appendix B | Insurance Program........... | B1 - B99 |
| Appendix C | Supplemental Unemployment Benefit Plan................... | C1 - C68 |
| Appendix D | Transfers to Other Plants.... | D1 - D4 |
| Appendix E | Profit Sharing Plan........... | E1 - E6 |
| Appendix F | Protected Employee Group Plan.......................... | F1 - F10 |
| Appendix G | Legal Service Plan............ | G1 - G6 |
| Appendix H | MACK-UAW 401(K) Plan.... | H1 - H11 |

APPENDIX B

INSURANCE PROGRAM
TABLE OF CONTENTS

| Article | Section | Description | Page |
|---|---|---|---|
| I | | | |
| | 1 | Continuation of Program | B 1 |
| | 2 | Continuation of Benefits | B 1 |
| | 3 | Definitions | B 2 |
| II | | | |
| | | Group Insurance | |
| | 1 | Eligibility | B 3 |
| | 2 | Life Insurance | B 4 |
| | 3 | Accidental Death and Dismemberment Insurance | B 8 |
| | 4 | Accident and Sickness Benefits | B 9 |
| | 5 | Reinstatement of Accident and Sickness Insurance During Layoff | B 13 |
| | 6 | Long-Term Disability Benefits | B 15 |
| | 7 | Continuation of Coverages | B 23 |
| | 8 | Company Obligation | B 28 |
| | 9 | Excess Insurance | B 29 |
| | 10 | Contributory Life Insurance | B 29 |
| | 11 | Plan Administrator | B 29 |
| | 12 | Definitions | B 29 |
| III | | | |
| | | Hospital-Surgical-Medical-Prescription-Drug-Dental-Vision-Catastrophic Expense Plans | |
| | 1 | Continuation of Plan and Eligibility | B 30 |
| | 2 | Hospital, Surgical, Medical, Catastrophic Benefits | B 33 |
| | 3 | Definitions | B 38 |
| | 4 | Prescription Drug Program | B 45 |
| | 5 | Dental Expense Benefits Program | B 51 |
| | 6 | Vision Expense Benefits Program | B 57 |
| | 7 | Company Contributions | B 63 |
| | 8 | Continuation of Coverages | B 68 |
| | 9 | Federal Benefits Provided by Law | B 71 |
| | 10 | Pre-Determination Review Program | B 73 |
| | 11 | Coordination of Benefits | B 75 |
| | 12 | COBRA Administration | B 77 |
| IV | | | |
| Letters | | General | B 78 |
| | | | B 86 |

ARTICLE I, SECTION 1

## APPENDIX B
## INSURANCE PROGRAM

### ARTICLE I

### SECTION 1. Continuation of Program

The Insurance Program which was attached as Appendix B to the Collective Bargaining Agreement between the parties dated October 28, 1992 (hereinafter called the "1992 Insurance Program" shall be amended, effective as of August 1, 1998, as herein set forth, and maintained by the Company as amended for the duration of the Collective Bargaining Agreement of which this Appendix B is a part.

### SECTION 2. Continuation of Benefits

Provision for payment of benefits under the 1992 Insurance Program shall continue in full force and effect in accordance with the conditions, provisions, and limitations thereof until August 1, 1998. On and after such date benefits will be provided and paid by the Company under the 1992 Insurance Program as herein amended (hereinafter called the "Program").

The Company shall arrange for group insurance coverage as here and after provided.

Such coverage shall be arranged at the Company's sole discretion, in any manner or through any organization, including, but not limited to, a program or programs provided by an insurance carrier; by arrangement with a hospital plan corporation, professional health service corporation, or similar plan or organization; through a health maintenance organization or similar plan or organization; through a preferred Provider arrangement; through a self-insured plan; or through a combination of any of such methods. The terms and conditions of coverage, including those amendments made in these negotiations, are continued on the assumption that the current arrangement to deliver benefits is continued on the traditional fee for service basis for the term of the labor agreement. The Company shall not exercise its option to select an alternate delivery system until the parties have reached mutual agreement

B    1

ARTICLE I, SECTION 3

on the terms and conditions including restrictions, limitations and definitions that would be applicable to any alternative delivery system.

The benefits provided under this Agreement,* including the terms and conditions of coverage, the rules for initial eligibility, continuation of coverage and other general conditions (including definitions and limitations) of coverage as amended from time to time pursuant to the mutual agreement of the parties, shall remain in effect during the term of this Agreement and shall not be altered by the provisions of any agreement between the Company and any benefit program provider. If there is a conflict between the language of this Agreement and that of any agreement between the Company and any benefit program provider, the language of this Agreement shall control.

* The benefits coverage in effect on the date of execution of this Agreement, including the terms and conditions of coverage the rules of initial eligibility, continuance of coverage and other general conditions of coverage contained in Appendix B and Publication Form 5551-360-0012 (Revised March 1, 1980 or its replacement except where there is a conflict between that Publication and those terms and conditions previously negotiated by the parties and set forth in an Appendix B those negotiated terms shall control to the extent necessary to resolve the conflict.)

SECTION 3. Definitions

1. "employee" means an individual who is actively at work within the bargaining unit on or after the effective date of this Agreement, or who, on or after the effective date of this Agreement, is, pursuant to the terms and conditions of the Collective Bargaining Agreement and Local Supplements, on personal leave of absence or on sick leave, maternity leave, vacation, or is permanently and totally disabled, but excluding one who is on military leave, or leave of absence with the International Union, or leave of absence because of election to federal, state, county or municipal office.

B 2

ARTICLE II, SECTION 1

2. "Disability retiree" means an individual who has retired and is eligible for benefits under the provisions of Section 3 of Article V of the Pension Plan, and is less than age 65.

3. "Early retiree" means an individual who has retired and is eligible for benefits under the provisions of Section 2 of Article V of the Pension Plan, or under any other agreement executed between the parties hereto.

4. "Normal retiree" means an individual who has retired and is eligible for benefits under the provisions of Section 1 of Article V of the Pension Plan, or under any other agreement executed between the parties hereto. It shall also mean an individual who has retired and is eligible for benefits under the provisions of Section 3 of Article V of the Pension Plan and who has attained age 65.

5. "Pension Plan" means the Mack-UAW Pension Plan attached as Appendix A to the Collective Bargaining Agreement.

ARTICLE II
LIFE INSURANCE, ACCIDENTAL DEATH
AND DISMEMBERMENT INSURANCE,
ACCIDENT AND SICKNESS INSURANCE, AND
LONG-TERM DISABILITY INSURANCE

SECTION 1. Date of Eligibility and Commencement of Insurance Benefits

An employee shall be eligible

(1) for Accident and Sickness Insurance and Long-Term Disability Insurance on the first day of the sixth month following the employee's date of employment and insurance shall thereupon commence, provided however, that if such employee is not at work on the day such employee would otherwise become insured the insurance does not take effect until the day the employee returns to work.

B 3

ARTICLE III, SECTION I

*"Company-Paid Sick Leave"* means the continuation of pay for absence due to illness or injury subject to the limitations described in the respective labor agreements.

*"Physician"* means a doctor of medicine, a doctor of osteopathy, a doctor of dental surgery and a doctor of podiatry legally licensed to practice within the scope of that license.

ARTICLE III
Hospital - Surgical - Medical - Prescription Drug - Catastrophic Medical - Dental - Vision Expense Plan

SECTION 1.

(a) Continuation of Plans

Except as modified by the provisions of this Article III, the Hospital-Surgical-Medical-Prescription Drug-Catastrophic Medical-Dental-Vision Expense Plans which were attached as a part of Appendix B of the Collective Bargaining Agreement between the parties dated October 28, 1992, will be continued by the Company (subject to their continued availability and to the condition that plans of other organizations providing the same benefits may by mutual agreement of the parties be substituted).

(b) Date of Eligibility and Commencement of Coverage

(i) An employee hired or rehired on or after the effective date of this Agreement shall be eligible for Hospital - Surgical - Medical -Prescription Drug-Catastrophic Medical Expense Plan coverage, Dental and Vision Expense Benefits Program coverage and hearing aid benefits on the first day of the fourth month following attainment of nine months of seniority.

ARTICLE III, SECTION I

(c) The Program will supplement benefits provided by the government, such as the Medicare benefits available under the Social Security Act. Effective on and after January 1, 1985, payments for Hospital-Surgical-Medical benefits otherwise payable under this Program will be reduced by the amount of benefit payments (or the amount of benefits that would be payable) under Medicare Part A (Hospital services) and Medicare Part B (Physician's services) on behalf of:

(i) retirees, spouses of retirees, and surviving spouses who are enrolled for Medicare Part A and Part B; and

(ii) employees who retire on or after November 1, 1984 and their spouses and/or their surviving spouses, as well as spouses of active employees who become surviving spouses on or after November 1, 1984 (provided such surviving spouse is eligible for a survivor pension benefit under the Mack-UAW Pension Plan), at such time as they are eligible for Medicare Part B regardless of whether or not enrolled for Medicare Part B.

Effective on and after July 1, 1993, payments for Hospital - Surgical-Medical benefits otherwise payable under this Program will be reduced by the amount of benefit payments (or the amount of benefits that would be payable) under Medicare Part A (Hospital services) and Medicare Part B (Physician's services) on behalf of:

(i) employees who retired prior to November 1, 1984 and their spouses and/or their surviving spouses, as well as spouses of active employees who became

ARTICLE III, SECTION 2

SECTION 2. Hospital, Surgical, Medical, Catastrophic Benefits

Arrangements will be made by the Company to provide the following additional benefits at Company expense:

(a) Effective January 1, 1985, benefits will be provided for eligible charges incurred in connection with ambulance service up to the reasonable and customary fee for such service when medically necessary (excluding air and boat). Effective January 1, 1999, benefits will be provided for eligible charges incurred in connection with air ambulance service when medically necessary to the nearest facility that can render treatment at 100%.

(b) Effective January 1, 1985, benefit coverage for substance abuse treatment will be extended to eligible dependents of active and retired employees. The term "substance abuse" shall include alcohol and drug addiction.

(c) Under the Catastrophic Medical Expense Benefit which became effective October 1, 1980 for disabilities commencing on or after October 1, 1980:

   (i) Effective on and after January 1, 1983, preexisting conditions will only be excluded from coverage for a period of one year following a subscriber's effective date. (A pre-existing condition is a disease or physical condition for which medical advice or treatment has been received within ninety (90) days immediately prior to a subscriber's effective date).

   (ii) Effective on and after January 1, 1983, coverage will be provided for the use of a licensed practical nurse, if a registered nurse is not available.

(d) Effective January 1, 1985, benefits will be provided for speech therapy as follows when prescribed by a physician and performed by a licensed or otherwise certified speech pathologist:

B 33

ARTICLE III, SECTION 1

surviving spouses prior to November 1, 1984 (provided such surviving spouse is eligible for a survivor pension benefit under the Mack UAW Pension Plan), who are eligible for Medicare Part B regardless of whether or not enrolled for Medicare Part B. The Company will continue to reimburse the retiree or surviving spouse the amount specified in Appendix A, Article V, Section 15 for the cost of the retiree's, or surviving spouse's Medicare Part B coverage, plus any applicable penalty due to late enrollment. In addition, the Company will reimburse the retiree for the cost of a spouse's enrollment for Medicare Part B, including any applicable penalty due to late enrollment. In order for the penalty charge to be reimbursed, it will be necessary for the retiree, the retiree's spouse and the surviving spouse to provide the Company with proof of the cost of their Medicare Part B coverage.

(d) Effective November 20, 1995, all active employees, retirees, and surviving spouses under the age of 65 who reside within an area where a mutually acceptable Managed Health Care Plan is available, shall participate in that Plan for their Hospital, Surgical, and Medical Services. Retirees and surviving spouses participating in a Managed Health Care Plan, who subsequently attain the age of 65 shall continue to participate in that Plan for their post-65 Healthcare coverage provided the Plan has a mutually agreeable program for this coverage.

(e) The Company and the Union shall jointly develop as set forth in Letter No. 8 of this Appendix a voluntary post-65 Health Care Plan known as "Medicare Risk Contracts" for post-65 retirees and surviving spouses who are not participating in a post-65 Managed Health Care Plan.

B 32

ARTICLE III, SECTION 2

(i)  speech therapy must be directed to the active treatment of disease, trauma, or congenital anomalies;

(ii)  limited to 30 sessions per calendar year. Benefits for additional sessions will be considered on an individual basis based upon documentation of medical necessity;

(iii)  in-patient benefits will not be provided if speech therapy is the sole reason for hospitalization; and

(iv)  therapy benefits are not payable for speech therapy treatment for psychosocial speech delay, behavior problems (including impulsive behavior and impulsivity syndrome), attention disorder, and mental retardation.

(e)  Effective January 1, 1985, the benefit allowance for audiometric hearing test when rendered by a physician or when prescribed by a physician and rendered by an audiologist will be $60.00, not more than once every 36 months.

(f)  Effective January 1, 1999, hearing aid payment will be up to $750 for one (or up to $1,500 for binaural when medically necessary), not more than once every 36 months.

(g)  Effective on and after January 1, 1983 the Medicare Approved List will be used for Prosthetic Appliances, Orthotic Appliances, and Durable Medical Equipment.

(i)  In addition, effective January 1, 1985, the following items will be covered although not covered by Medicare:

–  Portable Insulin Infusion Pumps: Battery-operated pumps attached to a needle or catheter that injects insulin continually as needed. Benefit limited to those with insulin-dependent type I diabetes mellitus and poor diabetic control, i.e., widely fluctuating blood sugar before mealtime; frequent

---

ARTICLE III, SECTION 2

episodes of insulin reaction; frequent significant ketosis; or diabetes complicated by pregnancy.

–  Electromagnetic Bone Growth Stimulators: Non-invasive device which signals release of calcium to mend bones. Benefit limited to fractures resulting from severe physical trauma, and which do not fuse, or long bone fractures which have not fused within 90 days. Can be substituted for invasive bone grafting.

–  Positioning Transportation Chairs: Light-weight chairs used in helping handicapped children between the ages of 2 and 14 years. Limited to non-deluxe, standard chairs.

–  Blanket supports (cradles); Neuromuscular stimulators (if prescribed by orthopedic or physiatric specialists).

(ii)  In addition, effective January 1, 1993, the following items will be covered although not covered by Medicare:

Home Phototherapy provided the following criteria is met:

–  infant is full-term, otherwise healthy, and at least 48 hours old when sent home for phototherapy;

–  serum bilirubin at onset of therapy is greater than 14 mg./dL but less than 18 (over 18 should be hospitalized);

–  appropriate diagnostic evaluation is carried out before instituting the home therapy; daily professional contact is maintained throughout the therapy; and

–  serum bilirubin is re-tested every 12 to 24 hours during therapy, and treatment is stopped when the concentration falls below 14 mg./dL.

ARTICLE III, SECTION 2

The below listed accessories for a child's wheelchair when medically necessary:

Bead seat – rigid custom molded system with foam padded covering consisting of the following section: seat and back section, ABS plastic shell, interfacing hardware necessary to mount system to wheelchair frame including fabrication time.

Bead seat – rigid custom molded seat only, with foam padded vinyl covering, plastic shell and interfacing hardware necessary to mount system to wheelchair frame.

Bead seat – rigid custom molded back only, with foam padded vinyl covering, plastic shell and interfacing hardware necessary to mount system to wheelchair frame.

Contact lenses when medically necessary as follows:

- Following cataract surgery – one pair per lifetime.

- Following cataract surgery if vision cannot be restored to better than 20/70 in better eye.

- Following cataract surgery for irregular astigmatism.

- For irregular corneal curvature.

- For keratoconus.

(iii) In addition to covering Continuous Passive Motion devices for treatment of certain knee problems following knee replacement or ligament repair, effective January 1, 1999, the following item will be covered although not covered by Medicare:

• Continuous Passive Motion devices for treatment of certain problems following elbow or shoulder surgery.

---

ARTICLE III, SECTION 2

(h) Effective August 1, 1998, for those members for whom Letter No. 5 of this Appendix does not apply, expand the outpatient psychiatric and substance abuse benefit to 60 visits per member and include alternate providers of care, when out-patient care is certified by the Pre-Determination Review Program to be in lieu of inpatient care at a hospital, residential treatment facility, or any other facility that provides inpatient treatment for psychiatric or substance abuse cases. The Pre-Determination Review Program will apply to inpatient confinement at facilities referenced in the preceding sentence. The expanded out-patient benefit described above does not affect the standard outpatient benefit which is amended to 30 visits per member per calendar year with a $10 co-payment per visit.

(i) Effective January 1, 1999, coverage will be provided for a routine mammogram up to $75 in accordance with the following guidelines:

| Age | Frequency |
| --- | --- |
| 35-39 | one mammogram in this period |
| 40-49 | one mammogram every two years |
| 50+ | one mammogram per year |

(j) Effective January 1, 1999, coverage will be provided for childhood immunizations (but not a routine office visit charge) in accordance with the following guidelines:

ARTICLE III, SECTION 3

| Type of Immunization | Doses | Frequency |
| --- | --- | --- |
| Diphtheria | 5 | at ages 2 months, 4 months, 6 months, 15 to 18 months, 4 to 6 years. |
| Oral Polio | 4 | at ages 2 months, 4 months, 15 to 18 months, 4 to 6 years |
| Measles, Mumps, Rubella (MMR) | 2 | at ages 15 to 18 months, 4 to 12 years |
| Hemophilus Influenza Type B (Hib) | 4 | at ages 2 months, 4 months, 6 months, 12 or 15 months. |
| Hepatitis B (HBV) | 3 | at birth or at ages 1 to 2 months, 1 to 2 months or 4 months, 6 to 18 months. |

SECTION 3.    Definitions for Hospital-Surgical-Medical Catastrophic Benefits

*Ambulatory Care Center*

This term means a public or private establishment with an organized staff of doctors and with permanent facilities equipped mainly to do surgery. It does not provide services or accommodations for patients to stay overnight, but it has the services of a doctor and a Registered Nurse at all times when a patient is present.

*Audiologist*

This term means a person who:

- Has a master's degree or doctorate degree in audiology or speech pathology from an accredited university,

- Has a certificate of Clinical Competence in Audiology or an Equivalency Certificate from the American Speech and Hearing Association, and

ARTICLE III, SECTION 3

- Is qualified in the state in which the service is provided to conduct an audiometric examination and hearing aid evaluation test for measuring hearing acuity and determining and prescribing the type of hearing aid that would best improve the covered person's loss of hearing acuity.

*Birthing Center*

This term means a health facility which provides a homelike setting under a controlled environment for the purpose of childbirth. It must be staffed, equipped, and operated to provide prenatal care, delivery and postpartum, and newborn care rendered within twenty-four hours after childbirth. It must be licensed or approved by the authorized agency of the jurisdiction in which it is located, or it must be listed with the National Association of Childbearing Centers.

*Claims Administrator*

This term means a third party which has entered into an agreement with the Company to provide services necessary to administer the benefits stipulated under the Plan.

*Custodial Care*

This term means:

The type of care or service which, even if ordered by a physician, is primarily for the purpose of meeting personal needs of the patient or maintaining a level of function (as opposed to specific medical surgical, or psychiatric care or services designed to reduce the disability to the extent necessary to enable the patient to live without such medical care or services). It may include, but is not limited to, help in getting in and out of bed, walking, bathing, dressing, eating and taking medication, as well as ostomy care, hygiene or incontinence care and checking of routine vital signs;

- Room and board and other institutional or nursing services which are provided for a person due to his or her age or

ARTICLE III, SECTION 3

mental or physical condition mainly to aid the person in daily living; or

- Medical services which are given merely as care to maintain the person's present state of health and which cannot be expected to improve a medical condition.

*Emergency*

- A medical emergency is defined to be the sudden, unexpected onset of a medical condition requiring urgent and immediate medical attention and treatment. Severe symptoms must occur and failure to obtain treatment immediately could result in significant impairment of bodily function, cause permanent damage, or be life threatening. Several examples of a medical emergency are convulsions, heart attack, hemorrhage, pneumonia, stroke, unconsciousness, etc. The signs and symptoms verified by the treating physician or hospital at the time of treatment, and not the final diagnosis, must confirm the existence of a threat to life or bodily functions.

*Extended Care Facility* (also referred to as "Skilled Nursing Facility")

This means an institution that provides room and board and skilled nursing services for medical care. It must have:

- One or more licensed nurses on duty at all times supervised on a twenty-four hour basis by a Registered Nurse or a doctor, and
- The services of a doctor available at all times in accordance with an established agreement.

The facility must also comply with the legal requirements which apply to its operation and keep daily medical records on all patients.

In order to qualify as an approved facility for benefits under the Plan, the facility must be accredited by the Joint Commission on Accreditation of Hospitals or recognized for benefits by the

B 40

ARTICLE III, SECTION 3

Secretary of Health and Human Services of the United States pursuant to title XVIII of Public Law 89-97 (Medicare).

This term does not include an institution, or part of one, used mainly for rest care, care of the aged, care of drug addicts or alcoholics, custodial care, educational care, or care of mental or nervous disorders.

*Freestanding Outpatient Physical Care Facilities*

This term means a health care facility separated from a Hospital that:

- is recognized for benefits as a provider of outpatient physical therapy services by the Secretary of Health and Human Services of the United States pursuant to Title XVIII of Public law 89-97 (Medicare) as amended, or

- meets the Claims Administrator's standards (including Medicare criteria) for freestanding providers of outpatient physical therapy programs and services.

*Home Health Care Service*

This term means a public or private agency or organization, or part of one, that mainly provides skilled nursing and other therapeutic services. It must be legally qualified in the state or locality in which it operates. It must keep clinical records on all patients. The services must be supervised by a doctor or Registered Nurse and they must be based on policies set by associated professionals which include at least one doctor and one Registered Nurse.

This term does not include a Home Health Care Service used mainly for the care and treatment of mental, nervous, or emotional conditions.

*Hospital*

The term "hospital" shall mean an institution accredited by the Joint Commission on Accreditation of Hospitals or the American

B 41

ARTICLE III, SECTION 3

Osteopathic Association. A hospital must meet all applicable local and state licensure and certification requirements and be accredited as a hospital by state or national medical or hospital authorities or associations, which in return for compensation from its patients, is primarily engaged in providing diagnostic and therapeutic facilities for the medical diagnosis, treatment, and care of injured and sick persons by or under the supervision of a staff of physicians who are duly licensed to practice medicine, and which continuously provides 24 hour a day nursing service by registered graduate nurses and which is not, other than incidentally, a nursing home, a place for rest, the aged, the treatment of pulmonary tuberculosis, mental disorders, substance abuse, or similar institution.

*Medically Necessary*

Medically Necessary means that the services or supplies provided by a hospital, doctor, or other provider are required for the diagnosis or direct care and treatment of a medical condition, and are:

- Appropriate and necessary for the symptoms, diagnosis, or treatment of a medical condition, and

- Within standards of good medical practice and recognized within the organized medical community, and

- The most appropriate level of service or supply which can safely be provided, and

- Not primarily for the convenience of the covered individual, the family, the doctor, or another provider.

*Member*

This term means either the covered person under this Program or any of the covered person's eligible dependents.

B 42

ARTICLE III, SECTION 3

*Participating*

This term means any hospital, extended care facility, out-patient physical therapy facility, home health care agency, physician, or other provider of health care services which at the time a member receives services included under this Program, has entered into a contract or agreement with the Plan to provide those health care services in accordance with this Program. Such contract or agreement shall include a provision that the provider accepts the payment as determined by the Plan, as payment in full (unless otherwise provided, such as required co-payments). A physician who is not a participating physician may participate for individual claims. For a hospital that is not participating, payment for covered services will be provided as described under the Program, unless limited by a specific provision as stated in the Program.

*Physician* (also referred to as "Doctor")

This term means:

- A physician legally licensed to practice medicine and surgery.

- The following when operating within the scope of their respective licenses: a doctor of medicine (M.D.); a doctor of Osteopathy (D.O.); for covered dental work, a doctor of dental Surgery (D.D.S.); for covered podiatry services, a doctor of podiatry (D.P.M.); and psychologists.

*Plan*

This term means the Company or a third party which enters into an agreement to provide the benefits stipulated under this Program.

*Provider*

This term means a physician, hospital, or other approved facility, agency or individual who is qualified to render service(s) or furnish materials under this Program.

B 43

ARTICLE III, SECTION 3

*Qualified Outpatient Psychiatric Care Facility*

This term means a facility that is an administratively distinct governmental, public, private, or independent unit or a part of such unit providing outpatient mental health services. The facility must have a psychiatrist on staff who has regularly scheduled hours in the facility and who assumes the overall responsibility for coordinating the care of all patients. This term includes centers for the care of adults or children of the nature of hospitals, outpatient psychiatric clinics, day treatment centers, night treatment centers, and community mental health centers as defined in the Federal Community Mental Health Centers Act of 1963.

- Outpatient Psychiatric Clinic

An outpatient clinic should meet the minimum standards established by the American Psychiatric Association, as published in its Standards for Psychiatric Hospitals and Clinics.

- Community Mental Health Center

A community mental health center, as defined in the Community Mental Health Centers Act of 1963, provides comprehensive services and continuity of care for the prevention, early detection, treatment, and follow-up care of psychiatric illness.

At a minimum, a community mental health center provides facilities for inpatient care, outpatient care, partial hospitalization, emergency service, and community consultation and education. The center is an administrative arrangement or a separate facility which may contract for hospital beds. To qualify for federal construction and/or initial staffing funds, a community mental health center may not be a proprietary institution.

Other acceptable treatment centers for the psychiatrically ill may contain some, but not the entire complex, of community mental health programs and offer distinct

ARTICLE III, SECTION 4

groupings of services. The term may include approved government outpatient psychiatric facilities.

*Reasonable and Customary Fee*

The Reasonable and Customary fee means the maximum benefit payable, as conclusively determined by the Plan, taking into consideration:

- The fee charged by the provider, and

- The range of usual fees customarily charged by providers with similar training and experience for the same service within the locality where the service was rendered, and

- The nature and complexity of the medical services that were furnished by the provider.

*Residential Treatment Facility*

This term means an institution (other than a hospital) established to care for and treat those who need inpatient medical care due to mental/nervous disorders, or alcohol and drug dependency.

The institution must have permanent facilities on the premises for inpatient medical care. The institution must be licensed, registered, or approved by the appropriate authority of the jurisdiction in which it is located, or it must be accredited by the American Hospital Association. It must keep daily medical records on all patients.

This term does not include an institution, or part of one, used mainly for rest care, nursing care, care of the aged, or custodial care.

SECTION 4. Prescription Drug Expense Coverage

Arrangements will be made by the Company to provide effective on and after January 1, <u>1999</u> the following benefits:

ARTICLE III, SECTION 4

(a) Definitions

1. *"Acquisition Cost"* means the actual cost of the drug to the provider or such amount that may be negotiated by the Plan with a participating provider.

2. *"Brand name drug"* means the trade name under which a drug is advertised and sold.

3. *"Copayment"* means the amount to be paid by the member for each separate prescription order or refill of a covered drug.

4. *"Covered drug"* means injectable insulin or any prescription legend drug (except contraceptive medication) that is dispensed according to a prescription order provided that:

   a) the drug is medically necessary for the treatment of an illness or injury;

   b) the amount of the prescription charge exceeds the copayment;

   c) the drug is not included or includable in the cost of other services or supplies provided to the member; and

   d) the drug is not entirely consumed at the time and place of the prescription order.

   A drug requiring a prescription by State Law, but not Federal Law, is not a covered drug.

5. *"Dentist"* shall mean a doctor of dental surgery or a doctor of dental medicine legally licensed to practice within the scope of that license.

6. *"Dispensing Fee"* means a fee predetermined by the Plan to compensate participating providers for dispensing covered drugs.

ARTICLE III, SECTION 4

7. *"Generic name drug"* means the chemical name of a drug that is FDA approved as therapeutically equivalent to a brand name drug.

8. *"Member"* means either the covered person under this Program or any of the covered person's eligible dependents.

9. *"Non-Participating Provider"* means any provider of pharmaceutical services that has not entered into a participating contract with the Plan.

10. *"Participating Contract"* means the agreement entered into between the Plan and the participating provider which shall set forth their respective rights and obligations.

11. *"Participating Provider"* means any pharmacy, physician, dentist or any other person or organization legally licensed to dispense drugs which has entered into an agreement with the Plan whereby, upon receipt of valid identification, credit shall be extended to the extent of the benefits described in this Section (b) to the member and reimbursement for the prescription charges to that extent shall be a responsibility of the Plan.

12. *"Pharmacy"* means a licensed establishment where prescription drugs are dispensed by a pharmacist licensed under the laws of the state where the pharmacist practices.

13. *"Physician"* means a doctor of medicine, a doctor of osteopathy or a doctor of podiatry legally licensed to practice within the scope of that license.

14. *"Plan"* means the Company or a third party which enters into an agreement to provide the benefits stipulated under this Program.

15. *"Prescription Charges"*.

   a. For a participating provider, prescription charge means the acquisition cost plus the dispensing fee for a covered drug except for injectable insulin. In the case of injectable insulin, prescription charge means the reasonable and customary charge or the acquisition cost plus the dispensing fee, whichever is lower.

ARTICLE III, SECTION 4

b. For a non-participating provider, prescription charge means the reasonable and customary charge for a covered drug as determined by the Plan.

16. "*Prescription Legend Drug*" means any medicinal substance - the label of which under the Federal Food, Drug and Cosmetic Act, is required to bear the legend: "Caution: Federal Law prohibits dispensing without prescription" and includes compounded medications containing at least one prescription legend drug.

17. "*Prescription Order*" means the request for medication by a physician or dentist as herein defined.

(b) Benefits

1. The Plan will pay to Participating Providers the covered Prescription Charges for Prescription Legend Drugs obtained by and for use of a Member.

2. The Plan will pay to the member in the event the service is rendered by a Non-Participating Provider, as follows:

   75% of pharmacy's reasonable and customary charges after the appropriate co-payment.

3. In addition to Prescription Legend Drugs, the Plan will pay for injectable insulin, on the basis of reasonable and customary charges, or the acquisition cost plus dispensing fee, whichever is lower, subject to provisions of (b)1 and (b)2.

4. Coverage will be provided for a one-month supply of disposable syringes and needles for injection of insulin when prescribed with a one-month supply of insulin or, if greater, 100 such disposable syringes and needles when prescribed with a three-month's supply of insulin.

5. Allergy injectables (i.e. serum/extract) are payable under the Plan. The allergy injectables are normally provided through a Physician's office (which is treated

---

ARTICLE III, SECTION 4

as a Non-Participating Provider) and are paid at 75% of the reasonable and customary charge after the appropriate co-payment. Member is required to submit a claim form for direct reimbursement.

6. A co-payment amount paid by the member is applicable for each separate prescription order and refill as follows:

   a. $10.00 for any prescription for a brand name drug for which there is a generic substitute available.

   b. $5.00 for any prescription for a brand name drug for which there is no generic substitute available.

   c. $5.00 for any prescription for a brand name drug that is specified by a physician as medically necessary when a generic substitute is available. The Company and Union have agreed to apply a stricter standard to administer this provision beginning March 1, 1999. Specific forms documenting the medical necessity of the brand name drug must be completed by the prescribing physician and submitted to the drug plan administrator for review and determination of medical necessity. If the completed forms are not received by the drug plan administrator, or if after review, the form does not document the medical necessity of the brand name drug, the $10.00 co-pay will apply. If the form documents the medical necessity of the brand name drug, the $5.00 co-pay applies.

   d. $5.00 for any prescription for a generic drug.

   A Participating Provider shall charge the member no more than the co-payment amount.

ARTICLE III, SECTION 4

It is the intent of this Program that the level of benefits shall be uniform for all Members, except in those instances where such might be contrary to the laws of the state in which the prescription is dispensed.

7. The Company and the Union have discussed the implementation of a coordination of benefits provision to fairly distribute the costs of prescription drugs with other employers. When the administrative guidelines have been finalized, an implementation date will be established no later than July 1, 1999.

(c) Exclusions

1. No benefit shall be available to a Member if such member is entitled to receive reimbursement under Workmen's Compensation laws or is entitled to benefits without charges from any municipal, state or federal program except Title XIX of Social Security Amendments of 1965 (Public Law 89-97 80th Congress, First Session) of any sort whether contributory or not.

2. Any charge for a contraceptive medication, even if such medication is a Prescription Legend Drug, and any charge for therapeutic devices or appliances (e.g., support garments, and other non-medicinal substances) regardless of their intended use.

3. Any charge for administration of Prescription Legend Drugs and Injectible Insulin.

4. The charge for medications furnished on an inpatient or outpatient basis covered under any other part of the Insurance Program, and another carrier providing group coverage for Prescription Legend Drugs, or injectible insulin through a Coordination of Benefits provision.

5. The charge for more than a 34-day supply of a medication, except, the Plan will cover up to a 90-day

B 50

ARTICLE III, SECTION 5

supply of medication under the Mail Service Program as described in Exhibit A.

6. The charge for any prescription refill in excess of the number specified by the physician, or any refill dispensed after one year from the physician's order.

7. Coverage will be automatically provided for new drugs at the time the drug is no longer considered experimental.

EXHIBIT A
MAIL SERVICE PRESCRIPTION DRUG PROGRAM

A. Covered Drugs

Maintenance Legend Drugs.

B. Benefits

1. A member may receive up to a 90-day supply of medication if the member's physician will prescribe such amount.

2. A co-payment amount as described in (b) 6 paid by the member is applicable for each separate prescription order and refill.

SECTION 5. Dental Expense Benefits Program

The Dental Expense Benefits Program, as in effect October 28, 1992 will continue to be provided at Company expense with the following specifications:

(a) Payment of Benefits

Benefits will be provided for eligible dental services when billed by the licensed dentist in charge of the case.

B 51

ARTICLE III, SECTION 5

Pre-authorization is routinely required for cases requiring $125 or more in benefits, including Space maintainers, Inlays, Crowns, Prosthetics, Periodontics and Orthodontics.

For services covered under the Basic Program, the Supplemental Basic Rider, the Prosthetic Rider and the Periodontic Rider, the maximum amount payable by the Plan in any one calendar year shall be $1,400.00 per member effective for services rendered on or after January 1, 1999. The maximum payable under the Orthodontic Rider is outlined in Section 5(f).

(b)  Basic Program - 100%

1.  Oral examinations.

2.  X-rays of the teeth.

3.  Topical fluoride application for member under age 19.

4.  Cleaning, scaling and polishing of teeth.

5.  Repair of broken dentures.

6.  Palliative emergency treatment of conditions causing dental pain.

7.  Fillings consisting of silver amalgam and synthetic tooth color restorations.

8.  Simple extractions.

9.  Endodontics (treatment of the tooth's nerve).

10. Consultation.

11. Space maintainers (not made of precious metals).

12. General Anesthesia administered in a Dentist's office.

---

ARTICLE III, SECTION 5

13. Oral Examinations performed to determine the need for and, if required, to plan a course of orthodontic treatment (includes study models and diagnostic x-rays).

14. Effective January 1, 1993, one lifetime application of tooth sealant on permanent posterior molars for dependent child age 14 or younger.

(c)  Supplemental Basic Rider - 100%

1.  Inlays and Crowns

(Not part of a bridge. No payment will be made for precious metal restorations unless the tooth cannot be restored with another material).

2.  Oral Surgery – including fracture treatment, cyst removal and surgical extractions. (Out-of-hospital only).

3.  Apicoectomy – dental root resection.

(d)  Periodontic Rider - 100%

1  Examination of gums and underlying bone.

2.  Treatment of gums.

3.  Gum surgery to remove infection and reshaping of the gums to prevent future problems.

4.  Bone surgery.

(e)  Prosthetic Rider - 50%

1.  Full or Partial dentures.

2.  Removable bridges (fixed bridges only when the replacement cannot be made by other methods).

3.  All necessary abutment work.

ARTICLE III, SECTION 5

4.   Relining of dentures as necessary.

(f)   Orthodontic Rider - 50%

Active treatment, including initial installation of necessary appliances. Maximum: $1,300.00 for treatment programs that begin on or after January 1, 1999.

Orthodontic benefits will be available for members under age 19, and for handicapping malocclusion only. Orthodontic Benefits will be continued beyond age 19 for a patient who is receiving orthodontic services upon the attainment of age 19 until the earlier of (1) completion of the current treatment plan or, (2) exhaustion of the maximum life-time orthodontic benefit.

(g)   Exclusions

1.   Services received from a dental or medical department maintained by or on behalf of any employer, a mutual benefit association, labor union, trustee or similar person or group.

2.   Services for which the member incurs no charge.

3.   Services for any occupational condition, ailment or injury arising out of and in the course of covered employment under Worker's Compensation or Occupational Disease Laws, Federal Employers' Liability Acts, or other similar State or Federal Employers' Liability Acts, or provided by the United States Federal legislation; or provided by the United States Veterans Administration; or provided without cost to the member by any federal, state, county, or municipal hospital, agency or instrumentality.

4.   Services with respect to congenital malformations or primarily for cosmetic or esthetic purposes.

B 54

ARTICLE III, SECTION 5

5.   Services, the cost of which has been or is later recovered in any action at law or in compromise or settlement of any claim.

6.   Services or supplies provided by any governmental body or instrumentality, whether federal, state or local, pursuant to any program under which any periodic payment of premiums, rate, enrollment fee or other similar charge is made by or for the member.

7.   Appliances or restorations used solely to increase vertical dimensions.

8.   Charges for services to the extent that such charges exceed the charge that would have been made and actually collected if no coverage existed hereunder.

9.   Services in a hospital performed by a dentist who in any case is compensated by the hospital for similar services when performed for patients.

10.   Local anesthesia when billed for separately by the dentist.

11.   Gold foil restorations.

12.   Complete mouth X-rays are limited to not more than once in any five year period, unless special need is shown.

13.   Oral examinations, periapical and bitewing X-rays, fluoride applications, and prophylaxis services are limited to not more than twice each calendar year.

14.   In all cases involving covered services in which the dentist and patient select a more expensive course of treatment than is customarily provided by the Dental Profession, consistent with sound professional standards of dental practice for the dental condition concerned, the Plan will pay the fee allowed for the lesser procedure. The dentist may charge the patient the difference for any amount over that for which the Plan is liable.

B 55

ARTICLE III, SECTION 5

15. In the event a member transfers from the care of one dentist to that of another dentist during the course of treatment, or if more than one dentist performs services for one dental procedure, the Plan shall be liable for not more than the amount it would have been liable for had but one dentist performed the service.

16. Services other than those specifically covered herein.

17. Unusual procedures and techniques.

18. In the event any services to which a member is entitled under this program are also covered under any other health benefit plan, the Plan reserves the right to take into account the services provided or paid for under such plan in its determination of amounts payable for services under this program.

19. Any denture or bridge replacement made less than 5 years after a denture or bridge placement or replacement which was covered under this Agreement.

20. Authorized benefits for a bridge or denture completed within 60 days after termination under this Agreement are the only benefits available after such termination.

The following additional exclusions will apply to employees hired on or after January 1, 1993:

21. Charges for an appliance, or modification of one, for which an impression was made before the member became covered under the Plan.

22. Charges for a crown, bridge, or gold restoration for which the tooth was prepared before the member became covered under the Plan.

23. Charges for root canal therapy if the pulp chamber was opened before the member became covered under the Plan.

ARTICLE III, SECTION 6

24. Charges for orthodontic procedures for which appliances were installed before the patient was covered by the Mack Dental Plan.

(h)    Definitions

1. *"Dentist"* means a doctor of dental surgery (D.D.S.) or a doctor of medical dentistry (D.M.D.) whose scope of practice is the diagnosis, prevention and treatment of diseases of the teeth and related structures.

2. *"Member"* means either the covered person under this Program or any of the covered person's eligible dependents.

3. *"Plan"* means the Company or a third party which enters into an agreement to provide the benefits stipulated under this Program.

SECTION 6. Vision Expense Benefits Program

The Vision Expense Benefits Program will continue to be provided at Company expense with the following specifications:

(a)    Covered Expenses

*"Covered Vision Expense"* means the charges (as defined in (b) of the Section 6 incurred for Vision testing examinations, lenses and frames as described below.

(1)    *"Vision Testing Examination,"* performed by a physician or optometrist, including a determination as to the need for correction of visual acuity, prescribing lenses, if needed, and confirming the appropriateness of eyeglasses obtained under the prescription. It shall include: history; testing visual acuity, external examination of the eye; binocular measure; ophthalmoscopic examination; and may include tonometry when indicated: medication for dilating the pupils and desensitizing the eyes for tonometry, if applicable; and summary and findings.

ARTICLE III, SECTION 6

(2) "Lenses" of a quality equal to the first quality lens series manufactured by American Optical, Bausch and Lomb, Orthodon, Tillier or Univis, and which meet Z80.1 or Z80.2 standards of the American National Standards Institute, including, when prescribed, equivalent plastic lenses or tints equal to Rose Tints No. 1 or No. 2.

(3) "Contact Lenses" as prescribed by a physician or optometrist.

(4) "Dispensing Service" performed by the physician, optometrist or optician who, based on prescription, prepares or orders the eyeglasses or contact lenses selected, verifies the accuracy of the lenses and assures that the eyeglasses or contact lenses fit properly.

(5) "Frames" adequate to hold lenses which are a Covered Vision Expense within the limits described in (b) of this Section 6.

(b) Benefit Payment

(1) Benefit payment will be made for the services rendered by a physician or optometrist as outlined in (a) (1) of this Section 6. Such benefit payment will be the actual charge but in no event more than the amount shown in Exhibit A.

(2) The maximum benefit payable for services and materials as described in (a) (2),(3), and (4) of this Section 6 shall be the actual charge for one (1) or two (2) lenses or contact lenses but not more than the amount shown in Exhibit A.

(3) Benefit payment will be made for frames as provided in (a) (5) of this Section 6 for the actual charge but not more than the amount shown in Exhibit A.

B 58

ARTICLE III, SECTION 6

EXHIBIT A

| Examinations | For Expenses Incurred on or After January 1, 1999 |
| --- | --- |
| Ophthalmologist | $45.45 |
| Optometrist | $37.40 |

Benefits will be provided for an additional Vision Testing Examination (as described in the Plan) performed by an ophthalmologist upon referral in writing by an optometrist, within 60 days of a Vision Testing Examination by the optometrist.

Lenses:
| | |
| --- | --- |
| (1) Single Vision per Lens | $21.45 |
| (2) Bifocal per Lens | $29.45 |
| (3) Trifocal per Lens | $37.40 |
| (4) Lenticular per Lens | $45.45 |
| (5) Contact per Lens | $29.45 |

Frames:  $28.15

(c) Contract Providers

The Company will attempt to establish contracts with suppliers of the materials and services provided in (a) (2), (3), (4) and (5) of this Section 6 in certain areas where the Company has employees. Such contracts will provide a predetermined selection of prescription lenses and frames to be provided without cost to the employee except for the cost of contact lenses in excess of the amounts shown in Exhibit A. If lenses, contact lenses, or frames are selected which are not included in the predetermined selection or additional services are ordered, the employee will be responsible for the additional cost in excess of the amounts shown in Exhibit A.

(d) Limitations

(1) "Frequency" - If a covered person has received a vision testing examination, lenses or frames for which benefits were payable under the Plan, or under the Company's safety eyeglass program, benefits will be payable for each subsequent vision testing

B 59

ARTICLE III, SECTION 6

examination or lenses only if received more than <u>12 months</u>, or frames only if received more than <u>24 months</u>, after receipt of the most recent previous vision testing examination, lenses or frames, respectively, for which benefits were payable under the Plan, provided, however, that lenses and frames received under the Company prescription safety glasses program for which no benefits were received under this Plan shall not be considered lenses and frames received under this Plan. Effective January 1, 1985, the vision testing examination date will be the control date for the <u>12 months</u> referenced above, if the initial date of dispensing is not more than 60 days following date of examination. An employee may utilize duplicate copies of the prescription for which a benefit is paid under this Plan to obtain lenses and frames under both the Plan and the Company's prescription safety glasses program if the employee is otherwise eligible under both and complies with the procedures of each.

(2) *"Prescription Change Required"* – If a covered person has received lenses for which benefits were payable under the Plan, no subsequently received lenses may be a Covered Vision Expense unless such lenses differ, by reason of a prescription change, from the most recently received lenses for which benefits were payable under the Plan. If a vision testing examination occurs at least <u>12 months</u> after the most recent previous examination which was covered by the Plan, it may qualify as a Covered Vision Expense even though the prescription is not different from the most recent previous prescription.

(e) Exclusions

Covered Vision Expense does not include and no benefits are payable for:

(1) Charges for which benefits are otherwise provided under the Insurance Program and charges set forth in "Exclusions" applicable to all Sections;

ARTICLE III, SECTION 6

(2) Sunglasses to the extent the charge for such lenses exceeds the benefit amount for regular lenses as provided in (b) (tinted lenses with a tint other than the equivalent of Rose Tints No. 1 or No. 2 are considered to be sunglasses for the purpose of this exclusion);

(3) Photosensitive or anti-reflective lenses to the extent the charge for such lenses exceeds the benefit amount for regular lenses as provided in (b);

(4) Drug or any other medication not administered for the purpose of a vision testing examination;

(5) Procedures determined by the insurance company to be special or unusual, such as, but not limited to, orthoptics, vision training, subnormal vision aids, aniseikonic lenses and tonography;

(6) Vision testing examinations and lenses or frames ordered:

(a) before the covered person became eligible for coverage; or

(b) after termination of coverage;

(7) Lenses or frames ordered while insured, but delivered more than 60 days after coverage terminated;

(8) Charges for vision testing examinations, lenses or frames which are not necessary, according to accepted standards of ophthalmic practice, or which are not ordered or prescribed by the attending physician or optometrist;

(9) Charges for vision testing examinations, lenses or frames which do not meet accepted standards of ophthalmic practice, including charges for any such services or supplies which are experimental in nature;

(10) Replacement of lenses or frames which are lost or broken unless at the time of such replacement the covered person is otherwise eligible under the

## ARTICLE III, SECTION 6

frequency and prescription change limitations set forth in (d); and

(11) Charges for the completion of any insurance forms.

(f) Definitions

As used herein:

(1) *"physician"* means any licensed doctor of medicine or osteopathy legally qualified to practice medicine and who within the scope of such physician's license performs vision testing examinations and prescribes lenses to improve visual acuity;

(2) *"optometrist"* means any person licensed to practice optometry in the state in which the service is rendered;

(3) *"optician"* means any person licensed in the state in which the service is rendered to supply eyeglasses prescribed by a physician or optometrist to improve visual acuity, to grind or mold the lenses or have them ground or molded according to prescription, to fit them into frames and to adjust the frames to fit the face;

(4) *"lenses"* means ophthalmic corrective lenses, either glass or plastic, ground or molded as prescribed by a physician or optometrist to be fitted into frames;

(5) *"contact lenses"* means ophthalmic corrective lenses, either glass or plastic, ground or molded as prescribed by a physician or optometrist to be fitted directly to the patient's eyes; these are subject to limitations and exclusions applicable to lenses generally; and

(6) *"frames"* means standard eyeglass frames into which two lenses are fitted.

B 62

## ARTICLE III, SECTION 7

SECTION 7. Company Contributions

(a) While Employed

The Company will make monthly contributions for the following month's coverage on behalf of each employee while the employee is at work (as defined below) toward the cost of the hospital - surgical - medical - prescription drug-catastrophic medical - dental - vision expense coverages des-cribed in this Article III equal to the full subscription rate or premium charge for the classification or coverage to which the employee shall be eligible according to the employee's marital status and number of the employee's dependents, provided that such coverage is not in excess of the coverage described in the next paragraph.

The coverage for which the Company will contribute under the foregoing will be, at the employee's option, protection for:

(i) self only,

(ii) self and spouse, or

(iii) self and family (including only spouse and eligible children).

Benefits will be extended to all eligible dependents whether the employee's dependents are registered or not.

For purposes of this Section, an employee shall be considered "at work" in any month if the employee receives pay from the Company for any time during such month.

(b) During Sick Leave

During the period an employee is on sick leave and unable to work on such employee's customary job or other available work or, on and after April 1, 1971, while an employee is receiving Long-Term Disability benefits after exhaustion of reinstated Accident and Sickness Benefits under Article II, Section 5 of the Insurance Program, the Company shall pay the full subscription rate or premium charge of hospital -

B 63

ARTICLE III, SECTION 7

surgical - medical - prescription drug - catastrophic medical - dental - vision coverages, if in effect, for an employee and the employee's eligible dependents for the duration of such absence; but not in excess of the greater of three years or the period equal to the employee's seniority when the absence commenced. For employees hired on or after January 1, 1993, the minimum period of three years will not apply.

(c)  During Layoff

Coverage under this Article III shall be provided for an employee laid off, and the employee's eligible dependents, without cost to the employee, through the month following the month in which the employee is laid off, including those employees laid off under any predetermined bumping system which limits job selections for bumping purposes and those employees taking a voluntary layoff under any collective bargaining agreement permitting the same. If, on or after April 1, 1971 a returning veteran, who would be entitled to reinstatement under the Master Bargaining Agreement if the employee had sufficient seniority, is not reinstated and is placed on layoff, the employee's coverages will be in effect at no expense to the employee for the balance of the month in which the employee is placed on layoff.

In addition, hospital - surgical - medical - prescription drug-catastrophic medical - vision expense coverages (but not dental expense coverages) shall continue to be provided for a laid off employee, and employee's eligible dependents, without cost to the employee, during a layoff meeting the conditions of Section 3 of Article I of the SUB Plan and including those employees laid off under any predetermined bumping system which limits job selections for bumping purposes and those employees taking a voluntary layoff under any collective bargaining agreement permitting the same, for each full calendar month of layoff (for which the employee receives no pay from the Company) for a maximum period determined in accordance with the applicable table in Article II, Section 7 (c). The day the employee reports for work shall be deemed to be the employee's last day worked prior to layoff, but only for

B 64

ARTICLE III, SECTION 7

purposes of determining the period of continuation and eligibility for Company contributions for such coverages.

An employee may continue hospital - surgical - medical - prescription drug - catastrophic medical - vision expense coverages (but not dental coverages) under this Article III during layoff without a break in seniority through the twelfth consecutive month following the last month of the employee's coverage for which contributions were made by the Company under this Section 7 (c), by paying in advance the monthly premium for such coverage.

The Company will furnish employees with the same information in writing as contained in Article II, Section 7 (c) as to their individual status under this Section 7 (c) at the time of layoff.

(d)  For Retired Employees

The Company will make monthly contributions on behalf of retired employees (not including a former employee entitled to or receiving a deferred vested pension), and their eligible dependents towards the cost of hospital-surgical-medical-prescription drug - catastrophic medical - dental - vision expense coverages provided under this Article III equal to the full subscription rate or premium.

(e)  For Surviving Spouses

The Company will make contributions on behalf of:

(i)  a surviving spouse receiving benefits under the Pension Plan, including Transition and Bridge benefits, if such surviving spouse, upon termination of such benefits, is eligible to receive a survivor benefit under Article V, Section 5 of the Pension Plan, and

B 65

ARTICLE III, SECTION 7

(ii) a surviving spouse of a deceased retired employee who was receiving benefits under the Pension Plan before the retired employee's death, and

(iii) a surviving spouse of a deceased employee who was eligible to retire under the Pension Plan but who had not retired, and

(iv) a surviving spouse of a deceased employee whose death resulted from an on-the-job accident with the Company on or after March 1, 1980. Such coverages shall be those the employee was eligible for at the time of death and shall continue until the spouse remarries, and

(v) a surviving spouse of a deceased employee whose death occurs on or after March 1, 1980, and who qualifies for Bridge Survivor Income Benefits (or who would have otherwise qualified for Bridge Survivor Income Benefits except such spouse will attain age 62 during the period of Transition Benefits) under the provisions of the Pension Plan, will be fully covered for six months immediately following the date when coverage would have ended,

and their eligible dependents towards the cost of hospital - surgical - medical - prescription drug - catastrophic medical - dental - vision expense coverage provided under this Article III equal to the full subscription rate or premium.

The Company will make suitable arrangements for a surviving spouse, while eligible to receive Survivor Income Benefits under Section 3, Article II, of Appendix B of the 1964 Agreement and under Article V, Section 6, of Appendix A of the Pension Plan (including for this purpose a surviving spouse receiving Mother's Insurance Benefit) and not eligible for a Survivor's Benefit under Article V, Section 5 of Appendix A - Pension Plan, to continue group hospital-surgical-medical-prescription drug coverages (but

ARTICLE III, SECTION 7

not catastrophic medical - dental and vision expense coverages) at the group rate subject to the availability of such coverage. The election with respect to such coverage must be made no later than three months following the month of the employee's death. The cost of such coverage will be paid by the surviving spouse.

(f) Eligible Children

Under hospital - surgical - medical - prescription drug - catastrophic medical - dental - vision expense coverages for self and family, eligible children shall include any child until the end of the calendar year in which he attains age 25 or any child of any age if totally and permanently disabled provided that such child is unmarried, legally residing with and dependent on an insured person under the Program for more than one-half of his support as defined by the Internal Revenue Code of the United States and either qualifies in the current year for dependency tax status or has been reported as a dependent on such insured person's most recent federal income tax return. Hospital - surgical - medical - prescription drug - catastrophic medical - dental vision expense coverages will be provided to eligible dependents, even though payment of benefits is delayed because the insured person has failed to enroll them.

(g) Sponsored Dependents

The Company will make available group hospital - surgical - medical - prescription drug coverages (but not catastrophic medical, dental and vision expense coverages) provided for in this Article III to sponsored dependents at the group rate cost. The employee shall furnish proof satisfactory to the Company that such sponsored dependents are dependent on the employee for more than 50% support as defined by the Internal Revenue Service, or as claimed on the employee's income tax form for the preceding year. If such dependent is not a blood relative, the dependent must reside in the employee's house-hold to be eligible for such coverage. Upon submission to the Company of such proof, such dependent shall be enrolled and the coverage effective on the first day of the following month thereafter. Enrollment for such dependents after the effective date must be made by

ARTICLE III, SECTION 8

the employee within 90 days of the date that such person becomes dependent for more than one-half support, otherwise such enrollment shall be made once annually in January of each year and such coverage shall be effective on the first day of the month following enrollment. Coverages provided under this Section for a sponsored dependent enrolled at the time of an employee's or retiree's death may be continued at the option of the employee's or retiree's surviving spouse while such spouse is enrolled for coverages as provided in Section 7 (e). The employee, retiree or surviving spouse shall pay the full additional costs of coverages under this Section 7 (g).

(h)   For California Employees

For employees in the California area served by the Kaiser Foundation Health Plans, the Company has made arrangements to afford them the option to subscribe to such plan in their area, as contained in the agreement between Mack Trucks, Inc. and Kaiser Health Foundation Plan, Inc. dated August 8, 1966 as amended instead of the coverages provided in this Article III, subject to the limitation on Company contributions contained in Article IV, Section 1, below. Subsequent opportunities with respect to such option shall be provided annually during an enrollment period between May 15 and May 31 of each year.

These same arrangements can be extended or continued with respect to similar plans by mutual agreement between the parties hereto in other areas where similar plans are or may become available. An employee who has retired from an area in which the coverage described in this Section 2 is made available to employees shall be given the option to subscribe to the group practice plan in that area instead of the coverages provided in Section 1 above.

SECTION 8. Continuation of Coverages

(a)   Sick Leave

During the period an employee is on sick leave and unable to work at his customary job or other available work, the

ARTICLE III, SECTION 8

Company will continue hospital - surgical - medical - prescription drug - catastrophic medical - dental - vision coverages, if in effect, for such employee and employee's eligible dependents without contribution by the employee for the greater of three years or a period equal to the employee's seniority as of the date sick leave commences. For employees hired on or after January 1, 1993, the minimum period of three years will not apply.

(b)   Leave of Absence (Other Than Sick Leave)

During the period an employee is on an approved leave of absence pursuant to the applicable collective bargaining agreement, other than leave with the International Union, leave because of election to federal, state, county or municipal office, or military leave, the Company will continue hospital - surgical - medical - prescription drug - catastrophic medical - dental - vision expense coverages for such employee without contribution by the employee through the end of the month in which the leave begins. Thereafter, hospital - surgical - medical - prescription drug - catastrophic medical expense coverages (but not dental and vision expense coverages) will be provided at no cost to the employee during the period an employee is on an approved leave of absence.

If the employee is on an approved local union leave he may continue the dental and vision expense coverages for the duration of such leave starting with the month following the last month for which contributions were made by the Company, by paying in advance the required monthly premium.

During the period an employee is on vacation the Company will continue hospital-surgical-medical-prescription drug-catastrophic medical-dental-vision expense coverages in force at no expense to such employee.

(c)   Layoff

Subject to any applicable federal or state law, an employee, on layoff may, by paying the full cost thereof at the group rate, continue such employee's hospital - surgical - medical -

ARTICLE III, SECTION 8

prescription drug - catastrophic medical - vision expense coverages (but not dental expense coverages) during layoff without a break in seniority through the twelfth consecutive month following the last month of the employee's coverage for which contributions were made by the Company under Section 7 (c) of this Article III.

(d) Recall While Disabled

An employee who is recalled from layoff and who is physically unable to return to work because of a disabling illness or injury incurred during the employee's layoff, shall be deemed eligible for benefits under the Insurance Program, provided that such employee furnishes the Company with proof satisfactory to the Company physician of said employee's bona fide illness or injury, and provided, further, that no such employee shall be entitled to such benefits if said employee is eligible to receive comparable benefits under any insurance program provided by another employer.

(e) While a Grievance is Pending

In the case of an employee terminated, discharged or suspended for disciplinary reasons, said employee's hospital - surgical - medical - prescription drug - catastrophic medical expense coverages (but not dental and vision expense coverages) will be continued at Company expense only through the month following the month in which such termination, discharge or suspension occurred; provided, however, that in the case of an employee terminated, who has a grievance pending for the reasons set forth in Section 7 (e) of Article II of the Program, hospital - surgical - medical - prescription drug - catastrophic medical expense coverages (but not dental and vision expense coverages) may be continued by the employee at the employee's expense at the group rate for the same period as Group Life Insurance is continued under such Section 7 (e). If the employee is reinstated, or the disciplinary layoff is reduced, the Company will reimburse such employee for the insurance contributions which the Company otherwise would have paid. Dental and vision expense coverages will cease at the end of the day in which loss of seniority occurs.

B 70

ARTICLE III, SECTION 9

(f) Retirement

Hospital - surgical - medical - prescription drug - catastrophic medical - dental - vision expense coverage will be continued at Company expense for retirees and their dependents (not including any employee who has less than ten (10) years of credited service and retires while on a sick leave or a former employee entitled to or receiving a deferred vested pension). The Company may, from time to time, request that a retiree or a surviving spouse attest to the eligibility status of their dependents towards whose coverage the Company contributes. If the retiree or surviving spouse fails to comply with such request, the Company may reduce the retiree's or surviving spouse's coverage to that of "self only", unless it can be demonstrated that the retiree or surviving spouse had an eligible dependent. An employee who retires and who, at the time of retirement has a dependent enrolled for sponsored dependent coverages, may continue such coverages after retirement by paying the required monthly contribution in advance.

(g) Return to Active Employment

In the event an employee's active employment ceases for any reason, if there was no break in the employee's seniority, then upon such employee's return to active employment all said employee's insurance coverage commences immediately.

SECTION 9. Federal Hospital - Surgical - Medical Expense
Benefits Provided By Law

(a)    The provisions of this Program pertaining to hospital - surgical - medical - prescription drug - catastrophic medical - dental - vision expense coverage shall not be applicable to employees or former employees

B 71

ARTICLE III, SECTION 9

(including retirees), who are or may become eligible for hospital, surgical, medical, drug, catastrophic medical, dental or vision coverage under any federal law providing such benefits for the public at large. Compliance by the Company with such laws shall be deemed full compliance with the provisions of this Program with respect to such employees or former employees eligible for benefits under such laws. If, as a result of such laws, the level of benefits provided for any group of employees or former employees or their dependents is generally lower than the corresponding level of benefits under the Program, the Company shall upon mutual agreement with the Union provide a plan of benefits supplementary to the federal benefits to the extent necessary to make total benefits as nearly comparable as practicable to the benefits provided under the Program, with such contributions by employees or former employees as are mutually determined to be consistent with the contributions established in this Program.

(b) The provisions of Subsection (a) above to the contrary notwithstanding and upon mutual agreement between the Company and the Union, the Company, may, if federal laws permit, substitute a plan of benefits for the benefits provided by the federal laws referred to in Subsection (a) above and modify the applicable provisions of this Program to the extent and in the respects necessary to secure the approval of such substitution from the appropriate governmental authority. The Company may make such plan available to employees and former employees, and require from them such contributions as are mutually determined to be consistent with the contributions established in this Section.

(c) Hospital - surgical - medical - prescription drug - catastrophic medical - dental-vision expense coverages provided employees or former employees (including retirees) under Article III may be reduced by the amount of such benefits provided under any Federal or State law. In cases where the employee exercises an

B 72

ARTICLE III, SECTION 10

option under any Federal or State law to take cash payments in lieu of hospital - surgical medical - prescription drug - catastrophic medical - dental - vision expense benefits, the equivalent of such payments will be required as a contribution toward the hospital - surgical - medical - prescription drug - catastrophic medical - dental - vision expense coverages provided in this Section, but not to exceed local plan premiums or subscription charges, and such contributions shall be deducted from the monthly retirement benefit payable to the employee under the Pension Plan.

SECTION 10. Pre-Determination Review Program
Effective November 16, 1991:

The Program consists of

1. Hospital Predetermination - reviews the medical necessity of non-emergency hospital admissions for medical, surgical, and psychiatric/ substance abuse treatment, (except maternity cases). Emergency admissions are not subject to predetermination but must be reported by the provider of care within 48 hours after admission.

2. Continued Hospital Review - monitors the length of hospital stays to ensure medical necessity of continued hospitalization.

3. Focused Surgical Review - assists the member in determining if a selected surgical procedure is medically necessary by providing a review by an independent physician and, where necessary, requiring a second opinion examination from a board-certified physician. If the need for surgery is not confirmed by the second opinion, the member may obtain a third opinion at no cost to the member.

4. Home Health Care Management - A voluntary program which can assist the member in arranging for home health care services when medical care is needed but hospitalization is not required or is no longer appropriate.

B 73

ARTICLE III, SECTION 11

benefit is available per episode of care, as long as the member would otherwise have some portion of the 45 days of inpatient care available.

SECTION 11. Coordination of Benefits

Coordination of benefits is required under the Hospital - Surgical - Medical - Prescription Drug - Catastrophic - Dental and Vision Programs when eligible expenses incurred by a member are covered by another private group health plan, a governmental program, or a statutory plan such as automobile No-Fault.

The Plan uses guidelines established by the National Association of Insurance Commissioners (NAIC) to determine the order in which coordinating plans will pay benefits. Under these guidelines, a plan without a coordination provision is always the primary plan. If all plans have coordinating provisions, the plan covering the patient directly as an employee, rather than as a dependent, will be primary, and the others will be secondary. If a child is covered under both parents' plans, the plan of the parent whose birthday falls earlier in the calendar year will be primary. If both parents have the same birthday, the plan that has covered a parent longer will be primary.

When parents are separated or divorced, their plans pay in this order:

1. The plan of the parent with financial responsibility for medical expenses of the child, when established under a court decree.

2. The plan of the parent with custody of the child.

3. The plan of the spouse of the parent with custody of the child.

4. The plan of the parent not having custody of the child.

5. In cases where dependent children of separated/divorced parents are subject to joint custody (and neither parent is

ARTICLE III, SECTION 10

5. Case Management - a voluntary program which recommends and arranges for alternative, non-hospital care. The alternative Care may consist of services covered under the health benefits plan and, in addition, services over and above present coverage such as private duty nursing or special equipment in the home to allow patients who would otherwise be confined to a hospital to live a more normal life within the family setting. The primary goal of case management is to design alternative treatment plans that maintain or improve the quality of life while providing more cost effective care.

All admissions approved by the Pre-determination Review Program will be covered in accordance with Plan provisions. Admissions which are not approved by the pre-determination review process are subject denial or reductions in payment for hospital and doctors charges. The member will not be responsible for hospital and doctor costs unless the member has been verifiably notified in writing that an admission request has been denied and the member enters the hospital against all medical advice, including the member's own doctor's.

However if the member's doctor or hospital fails to request pre-determination approval for an inpatient hospital stay, the member will not be held responsible for any expenses resulting from denials or reductions in payments for covered services. Details of the program are contained in the Pre-determination Review Program booklet.

Effective August 1, 1998, for those members for whom Letter No. 5 of this Appendix does not apply, the Pre-determination procedures will also apply for inpatient confinements to a residential treatment facility or any other facility that provides inpatient treatment for psychiatric or substance abuse(alcohol and drug addiction) cases. As part of the review process, alternate types of treatment such as day treatment and intensive outpatient therapy treatment may be recommended. In such cases, when certified by the Pre-determination Program to be in lieu of inpatient care, an expanded outpatient benefit of 60 visits as described in Article III, Section 2(h) will apply. This benefit is in addition to the amended 30 visits standard outpatient program. They are separate benefits with no inter-relation. The 60 visits

## ARTICLE III, SECTION 12

or receives a judgment, the Plan may recover any benefits paid by the Plan. The Plan may also attempt to recover benefits by filing a lawsuit.

### SECTION 12. COBRA Administration

The parties confirm their understandings with respect to the administration of the health care coverage continuation provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA or the Act), as amended.

These understandings are based upon current reading of the Act and of regulations for COBRA issued by the Internal Revenue Service. If amendments to the Act or the regulations preclude administration in accordance with these understandings, the Company will inform the Union of any changes necessary to bring the Company into compliance with COBRA.

(a) The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), as amended, was implemented January 1, 1988 for active employees covered under the Program. COBRA provides continuation rights to certain employees or dependents who would ordinarily lose eligibility for coverage under the health care program rules.

(b) For purposes of COBRA, this Program is considered to be a single plan offering "core coverages" (hospital, surgical, medical catastrophic, prescription drug), and "non-core coverages" (dental and vision), regardless of the delivery system chosen by the employee, or of the entity chosen by the Company to administer such coverages on the Company's behalf.

(c) The Company is responsible for providing notifications, as required under COBRA, to "qualified beneficiaries," as defined therein. The Company may delegate the administrative functions associated with COBRA.

(d) To the extent the Company makes alternative continuation privileges available under Article III of the

B 77

## ARTICLE III, SECTION 11

designated as specifically responsible for health care expenses), the birthday rule is applied.

If benefits have been provided before the Claims Administrator knows of a court decree establishing financial responsibility for the medical expenses of the child, the first point listed above does not apply.

The Plan will not coordinate with an individual insurance policy purchased by the member or with any group policy covering a member for which the member pays more than 50% of the cost of the coverage.

### COMPUTATION OF BENEFITS

When the Mack Program is the primary plan, benefits will be paid without regard to any other plan. The secondary plans may then coordinate benefits so that total benefits paid by all of the plans will not exceed total expenses incurred by the member.

If the Mack Program is not the primary plan, the primary plan will pay benefits without regard to the Mack Program. The Mack Plan will subtract the benefits paid by the primary plan from the eligible expenses incurred. The Mack Plan will pay the lesser of the remaining eligible expenses or the maximum amount that would have been payable if the Mack Plan was primary. In no event, however, will the combined benefit payments from both plans exceed the eligible expenses incurred.

The Plan will have the right to give or receive any information, without prior consent, that may be necessary to administer the Coordination provisions.

The Plan has the right to recover overpayments and payments made for benefits that were covered by another private group health plan, a governmental program, or a statutory plan such as Workers' Compensation or automobile No-Fault. If a payment has been made, but is determined to have been paid erroneously, the Plan may recover these payments.

If a member has expenses that resulted from the negligence or wrong doing of a third party, and the member reaches a settlement

B 76

ARTICLE IV, SECTION 1

Program that do not satisfy all the requirements for "COBRA continuation coverage," the members shall have the opportunity to elect either the COBRA continuation coverage or continuation under the Program. An election of COBRA continuation coverage will terminate the member's eligibility for Program continuation.

(e) To the extent the Company makes alternative continuation privileges available under Article III of the Program that do satisfy all the requirements for "COBRA continuation coverage," such alternative continuation privileges will be integrated with the COBRA continuation coverage.

ARTICLE IV
General

SECTION 1.

(a) In the event that a group practice direct service medical or dental care plan is established or is available in any location where a facility of the Company is located, the parties agree that, subject to the group practice plan satisfying both parties as to the comprehensiveness and quality of services provided, each employee in such location will annually be offered the opportunity to choose between the group practice plan and the medical or dental care coverage as outlined herein. The Company will pay to the group practice plan, on behalf of those employees selecting such coverage an amount equal to what it would have paid for the coverage outlined herein.

(b) The Company and the Union agree to develop and implement mutually acceptable Managed Health Care Plans (the Plan) as the alternative to the traditional indemnity plan and an optional alternative to the HMO plans for hospital - surgical - medical services, excluding psychiatric and substance abuse services. The goal of the Plan is to provide easily accessible, high quality service with comprehensive coverage and to contain the significantly increasing health

B 78

ARTICLE IV, SECTION 2

benefits costs. The Plan would apply to employees, retirees, and surviving spouses under age 65 and their eligible dependents and would provide certain enhancements to coverage.

The Union and the Company will jointly develop and conduct educational sessions to inform the membership of the newly-developed Plan.

SECTION 2.

A committee composed of two members designated by the Union and two members designated by the Company shall be established to study and evaluate the hospital - surgical - medical - prescription drug - catastrophic medical - dental - vision expense program established herein and to make recommendations for the purpose of achieving the maximum coverage and service for the individuals covered by the various hospital - surgical - medical - prescription drug - catastrophic medical - dental - vision expense plans for the money spent for such protection. In the performance of its duties, this Committee shall consult with and seek the advice of representatives of organizations providing health insurance benefits and services and keep the Union and the Company informed.

SECTION 3.

(a) Each year the Company will furnish or will request the insurance company to furnish the Union the following information;

1. Number of employees insured and aggregate insurance in force by insurance bracket and by type of coverage during a representative month in the preceding policy year;

2. Average number of lives insured by type of coverage in the preceding policy year;

B 79

## ARTICLE IV, SECTION 4

3. Unit premiums, total premiums paid, claims paid and incurred, by type of coverage for the preceding policy year;

4. Increase in reserves, by type of reserve, during the preceding policy year;

5. Interest allowed on reserves, expenses and taxes, net cost, refund of excess premiums and employee contributions for the preceding policy year;

6. Amount of reserves by type of reserve at the end of the preceding policy year;

7. Number of insured deaths by insurance brackets, age and sex of deceased for the preceding policy year;

8. Frequency and average duration of accident and sickness benefit claims closed during the preceding policy year; and

9. The number of employees and retirees shown separately with hospital-surgical-medical-prescription drug catastrophic medical-dental-vision expense coverages by enrollment classifications and plan areas in the preceding policy year.

(b) The Company will provide the Union with copies of the group insurance contracts only to afford the Union an opportunity to raise any questions it may have and make any suggestions it may wish.

### SECTION 4

The provisions of Article 2, Section 5, of the 1961 Insurance Program relating to retirees in the Sidney Bargaining Unit shall continue in effect, except that, on and after January 1, 1965, the Company will pay the full cost of the coverages provided thereunder.

## ARTICLE IV, SECTION 5

### SECTION 5

(a) The question of whether or not an employee is eligible for participation in the Program within the meaning of this Agreement may be determined through the grievance procedure at the plant where the employee works or worked.

(b) In the event of any conflict between the provisions of the Insurance Program, (i.e., Appendix "B") and the provisions of any Insurance Policy or Rider, the provisions of the Insurance Program will supersede the provisions of such Policies or Riders to the extent necessary to eliminate such conflict.

It is understood that no grievance procedure of any collective bargaining agreement between the parties hereto shall apply to the Insurance Program or any insurance contract in connection therewith and that any claim for an insured benefit will be presented for settlement only to the insurer. Claims that are not settled in accordance with the terms of the Insurance Program shall be resolved in accordance with the following procedure.

Procedures will be developed at the local operations with respect to discussions between Company and Local Union representatives in regard to the status of benefit claims presented under the Insurance Program.

In the event that local procedures do not result in disposition of the claim, the Corporate Human Resources Department will furnish upon request of the Director of the UAW-Agricultural Implement Department any necessary information concerning the status of a claim upon which the question has arisen.

After the Corporate Human Resources Department has furnished information concerning the status of a claim, the Director of the UAW-Agricultural Implement Department may request a meeting with representatives of the Company at the World Headquarters of the Company for the purpose of discussing any specified claims upon which questions remain. The date upon which such meetings are to be held will be determined by mutual agreement. All questions raised with respect to such claims will be based on

## ARTICLE IV, SECTION 6

the provisions of the Insurance Program, and the responses to such questions will be in accordance with such Program.

In the event the response of the Corporate Human Resources Department does not resolve the claim, and, in the opinion of the Union, the response violates any provision of the Insurance Program, the Union may request the appointment of an Impartial Arbitrator to hear and determine such dispute. Such Arbitrator will be the Permanent Arbitrator under the Master Agreements unless within thirty days after such request another person is selected by mutual agreement.

The Arbitrator shall make his decision in accordance with the applicable provisions of the Insurance Program and he shall have no authority to add to or subtract from or modify any of the terms of the Insurance Program, nor to change or add to any benefit provided by the Insurance Program, nor to waive or fail to apply any requirement of eligibility for a benefit under the Insurance Program.

No decision of an Arbitrator in one case shall create a basis for a retroactive adjustment in any other case prior to the date of written filing of such other claim.

There shall be no appeal from any ruling by the Arbitrator which is within his authority. Each such ruling shall be final and binding on the Union and its members, the employee or employees involved, and on the Company. Any case referred to the Arbitrator on which he has no authority to rule shall be referred back to the parties.

The Company and the Union shall bear equally the fees and expenses of the Arbitrator.

SECTION 6.

The Company shall be the Plan Administrator and shall be responsible for the general administration of the Plans and for carrying out the provisions thereof. The Plan delegates discretionary authority to the Plan Administrator to interpret the Plan on all issues of coverage and operation.

## ARTICLE IV, SECTION 7

The Company shall also be the named fiduciary with respect to the Plans and may delegate to various officers, employees and committees of the Company authority, as well as the right of delegation, to carry out such of its responsibilities as it deems proper to the extent permitted by the Employee Retirement Income Security Act of 1974 as now in effect or as hereafter amended.

SECTION 7.   Miscellaneous Understandings Regarding Healthcare Coverage

A.   Pre and Post-Exposure Treatment for Rabies

*Pre-Exposure*

— Benefits are provided at 100 percent of the reasonable and customary (R&C) fee for the administration of rabies immunizations when administered and billed by a doctor, or hospital.

*Post-Exposure*

1. The initial treatment at either the hospital or doctor's office is covered at 100 percent of the reasonable and customary fee.

2. If the patient needs additional treatment after the initial visit, the following applies:

— If rendered at the out-patient department of the hospital, the charge for the use of the facility (or emergency room) and/or any doctor charges are applied to the Catastrophic coverage. The charge for the serum is covered under the Prescription Drug Program at 75 percent after the appropriate co-payment per treatment.

— If rendered at the doctor's office, a charge for an office visit is applied to the Catastrophic coverage. The charge for the serum is covered under the Prescription Drug Program at 75 percent after the appropriate co-payment per treatment.

ARTICLE IV, SECTION 7

B. HIV Testing

Coverage will be provided for HIV testing on the same basis as other covered diagnostic tests. Such test must be appropriate and necessary for the symptoms, diagnosis or treatment of a medical condition.

C. Change in Article II, Section 7(c)

As a result of deleting the eleven months of additional coverage after the charts in Article II, Section 7(c) reflecting SUB credits and seniority, it is understood that an employee on layoff continues with any applicable additional coverage. However, any employee who is recalled after the effective date of this Agreement and subsequently laid off, the additional coverage is not applicable.

D. Retiree Health Care Benefits

1. In regards to Company-paid post-retirement health care benefit costs, the parties have reached an understanding as contained in the letter titled Retiree Health Care Benefits, and in relationship to that understanding have established the following post-retirement health benefit "cap" approach:

| | Per Retiree/Surviving Spouse Health Care Benefit Costs | |
| --- | --- | --- |
| | Age 64 and Under | Age 65 and Over |
| 1991 Actual | $ 6,864 | $2,187 |
| 1992 Projected | $ 7,894 | $2,515 |
| 1993 CAP | $ 9,670 | $3,081 |
| 1994 CAP | $11,846 | $3,774 |
| 1995 CAP | $14,511 | $4,623 |

2. Notwithstanding any other provision contained either in the Memorandum of Agreement dated April 15, 1993 or in the 1992 Master Agreement, the Union will be free to take concerted action, including the right to strike, as of October 26, 1995 if the parties fail to reach a mutually satisfactory agreement concerning all of the issues surrounding retiree health care during the Extension Period as defined in the

ARTICLE IV, SECTION 7

April 15, 1993 Memorandum of Agreement, particularly those related to the existing post-retirement health expenditure "caps".

As part of these discussions, the Company reserves the right to raise potential concerns it may have regarding the cost of health care in the context of its competitive environment, and the Union likewise, reserves the right to raise its concerns about the appropriate utilization of actual and potential savings that would flow to the Company through adoption of national health care program.

E. Resolution of Hold Harmless definition of Reasonable and Customary Fee and Balance Bills for Covered Medical and Dental Services

For the term of this 1998 Master Agreement, the Company will continue to pay a balance bill for covered services on the same basis as it was done under the 1992 agreement for providers who participate with the Blue Cross/Blue Shield program. The Company will also continue to pay any balance bills for covered services provided under the program administered by the current carrier or any future carrier covering charges by providers who currently participate or who agree to participate in the program. A balance bill is defined as the difference between a provider's charge and the reasonable and customary fee as determined by the Plan.

F. Major Medical coverage and Contributory Life Insurance that was continued for certain active UAW represented employees shall cease upon ratification of this Agreement. The Major Medical coverage will be changed to the Catastrophic coverage and employees will have a conversion privilege for the Contributory Life Insurance. Should these coverages be again given to the non-bargaining employees, the UAW represented employees under this Section shall be given the same privilege.

LETTER #6

May 27, 1998

Mr. Jack Laskowski
Vice President and Director
UAW Mack Trucks Department
Solidarity House
8000 East Jefferson Avenue
Detroit, Michigan 48214

Re:  U.S. Health Care System Concerns

Dear Mr. Laskowski:

Mack and the UAW have long recognized the major problems we jointly confront with the U.S. health care system. The Company and the UAW share a serious concern about the high cost of the health care system and the large number of uninsured. The high cost of health expenditures diverts corporate funds from other business priorities that will enable Mack to compete more effectively in the market place. Despite the Company's and UAW's efforts to manage our health care programs offered to members of our Mack family, Company health care costs have continued to increase at unacceptable rates. Indeed, the increasing amount of national resources allocated to health care, at the expense of other national priorities, adversely impacts the nation's ability to compete with other industrialized countries.

Both Mack and the UAW share the common objective for a high quality health care delivery system within our nation that is accessible to all and which functions in a cost effective manner. In this regard, Mack and the UAW jointly agree to support approaches directed towards achieving prompt and lasting private sector and national policy solutions which will assure high quality care to all individuals. Such approaches should include strong cost containment, equitable financing, and appropriate quality assurance mechanisms.

Very truly yours,
MACK TRUCKS, INC.

S. L. Torrence
Executive Vice President
Administration

B 94

---

LETTER # 7

May 27, 1998

Mr. Jack Laskowski
Vice President and Director
UAW Mack Trucks Department
Solidarity House
8000 East Jefferson Avenue
Detroit, Michigan 48214

Re: Retiree Health Care Benefits

Dear Mr. Laskowski:

During our 1992 negotiations, the parties had lengthy discussions concerning the significant negative impact that the new accounting standard for post retirement benefits (FAS 106) would have on Mack Truck's financial situation, and the potential serious consequences this in turn could have on the ability of its parent company to obtain necessary capital, not only from traditional sources but also through public equity offerings it might otherwise choose to undertake. After reviewing various alternatives to minimize the negative impact of these financial accounting standards, the parties agreed to the so-called "cap" approach contained in Appendix B of the Health Insurance Program.

It is the purpose of this letter to state unequivocally that:

(1)  The aforementioned "caps" were established for the purpose of minimizing the financial impact of FAS 106 while still complying with the purpose and intent of such standard;

(2)  The Company and the Union both recognize the need to control health care cost, while at the same time providing quality professional care. It is understood that we will work jointly to control the cost impact on the Corporation;

B 95

(3) The Company fully recognizes, acknowledges and hereby confirms that retiree health care benefits for Mack-UAW employees have been and will continue to be lifetime benefits, and that the establishment of these "caps" in no way modifies or negates this commitment.

Very truly yours,

MACK TRUCKS, INC.

S. L. Torrence
Executive Vice President
Administration

B 96

LETTER # 8

May 29, 1998

Mr. Jack Laskowski
Vice President and Director
UAW Mack Trucks Department
Solidarity House
8000 East Jefferson Avenue
Detroit, Michigan 48214

Dear Mr. Laskowski:

During the 1998 negotiations, the parties discussed at length alternatives to control healthcare costs for Medicare eligible retirees. It was determined that Medicare Risk programs was the best alternative for all concerned.

For that reason, Mack representatives and an International UAW representative knowledgeable in the Medicare Risk programs will meet at Mack Trucks World Headquarters to develop an implementation plan for optional Medicare Risk Plans (Plans) for the Lehigh Valley, Pennsylvania UAW members. This plan will go into effect no later than July 1, 1999. The parties will meet according to the following schedule to ensure this effective date:

MEETING          OBJECTIVE

September '98
- The UAW will provide and explain data and information requirements for the Plan(s) including, but not limited to:
  - minimum standard requirements of Plan
  - financial data of plan
  - measurement of quality standards of Plan

- The parties will resolve all issues related to UAW standards as to compatibility with available programs. The parties

B 97